IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

JASON M. DeFAZIO,           )
                            )
        Plaintiff,          )
                            )
vs.                         )   Case No. 05-3464-CV-S-ODS
                            )
JO ANNE BARNHART,           )
Commissioner of Social Security, )
                            )
        Defendant.          )

ORDER AND OPINION AFFIRMING
COMMISSIONER'S FINAL DECISION DENYING BENEFITS

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying his application for supplemental security income benefits. The Commissioner's decision is affirmed.

Background

Plaintiff was born in 1974 and has a high school education. His past relevant work include jobs as a mechanic, deliverer, sales route driver, customer service representative, retail store manager and lubrication technician. R. at 348-49. Plaintiff initially filed his claim for disability benefits after he injured his back after a workplace incident on May 2, 2002. R. at 326.

The evening of the accident at work, Plaintiff's wife took him to the emergency room at Cox Health Systems. R. at 140. He reported that he fell into a hole at work, landing on his coccyx. Upon examination, his bone density appeared normal, and there was no apparent fracture, dislocation or deformity. R. at 144. He was instructed to use an ice pack, not return to work for at least two days and prescribed Vicodin. R. at 143. Plaintiff returned to work, but was terminated on May 21, 2002, because he was unable to perform the physical requirements of his job without assistance. Plaintiff stated he could no longer fulfill his daily duties, physically or mentally. R. at 84.

On June 12, 2002, Plaintiff presented to Concentra Medical Centers in

Springfield, Missouri, where he was treated by Michael Linn, PT. R. at 170. Upon examination, Plaintiff was noted to be well-nourished, well-developed and in no acute distress. Linn recommended physical therapy and instructed Plaintiff on a Home Exercise Program. R. at 170. Plaintiff returned the following week and had not completed any physical therapy. Plaintiff was referred to an orthopedic surgeon. He was prescribed Celebrex and instructed to take Tylenol as needed. R. at 167.

On June 21, 2002, Plaintiff went to Ozarks Area Orthopaedic Associates and met with Dr. Paul Olive and his physician assistant, Paul Hultman, for a Worker's Compensation evaluation. R. at 207. Plaintiff reported that his back pain had been fairly consistent since the injury. Plaintiff complained of daily discomfort and soreness when sitting for a long period of time. R. at 207. At the time, Plaintiff was taking Celebrex and Vicodin for pain. R. at 206. Examination of his back revealed no visual abnormalities, but he had tenderness to palpitation at the lumbosacral junction off to the right side. Plaintiff had full range of motion of his hips, knees and ankles. A Radiograph examination of the lumbar spine revealed some mild degenerative changes at L5-S1 with some disc space narrowing. R. at 206. Dr. Olive's impressions included discogenic back pain, secondary to degenerative disc disease at L4-5 and L5-S1, annular tears as L4-5 and L5-S1, and spinal stenosis at L4-5 and L5-S1. R. at 206. Plaintiff was approved for the physical therapy FIT program three times a week for four weeks. R. at 205.

Plaintiff returned to Concentra on June 26, and reduced his pain rating to a two on a scale of one to ten. R. at 160. On June 28, Linn noted Plaintiff's condition related to presenting diagnosis was improving. Plaintiff reported improved functional status and demonstrated compliance with scheduled therapy visits. R. at 158. On July 1, Plaintiff reported he continued to have primarily centralized lower back pain, with occasional pain down the posterior thigh. He rated his pain a four. R. at 153. On his final visit at Concentra, Plaintiff complained of back pain aggravated by bending, lifting and prolonged sitting. R. at 147. He rated his pain 6-7 on a scale of one to ten. Linn recommended physical therapy three times a week until Plaintiff's recovery goals were met, progress plateaued or the next medical check. R. at 148.

On July 9, 2002, Plaintiff presented to Springfield Physical Medicine for a lumbar epidural steroid injection. R. at 181. Plaintiff had a good initial response to the injection, but later experienced some return of his previous symptoms, although not as severe. R. at 180. He received two more injections on July 25 and September 9. R. at 179.

On July 19, 2002, Plaintiff returned to Dr. Olive for a follow-up to his back pain. He noted some improvement as a result of the epidural injection, but complained of some pain in his buttock. R. at 205. He continued to have some back pain and muscle spasms. During his examination, Dr. Olive noted Plaintiff sat with a slightly forward list. He had tenderness to palpatation in the paraspinal muscles of the right lower extremity. Dr. Olive recommended Plaintiff continue with the FIT program. R. at 204.

On July 30, 2002, Plaintiff again met with Dr. Olive and reported no radicular pain. R. at 204. Plaintiff reported making progress in the FIT program. On August 23, 2002, Plaintiff requested a refill on Skelaxin, a muscle relaxant, and Dr. Olive approved this request. R. at 204. On August 27, 2002, Plaintiff complained of numbness in his legs after walking for a prolonged period of time. He also noted his legs feel "a little wobbly" as he is walking. He was not having any lightheadedness at that time. R. at 204.

On September 19, 2002, Plaintiff went to Dr. Olive for another follow-up for his back. R. at 203. After his final epidural injections, Plaintiff felt a significant increase in back pain over the ensuing week. He reported difficulty stepping down on his left leg. R. at 203. During his conversation with Dr. Olive, Plaintiff sat on the chair leaned forward on his hands. R. at 203. He was given another refill of Celebrex and Skelaxin at that time. R. at 203.

On October 17, 2002, Plaintiff had a follow-up appointment with Dr. Olive. R. at 202. It had been three weeks since he completed his physical therapy and he reported not having any problems with leg pain at that time, but continuing back pain. He reported that he continued to work, using Celebrex and Darvocet to manage the pain. R. at 202. Dr. Olive recommended Plaintiff avoid surgery for his back pain. Plaintiff indicated to Dr. Olive that he would be changing occupations, possibly moving in to the mortgage business. R. at 202. On November 15, 2002, Plaintiff returned for another

follow-up and requested another prescription for pain killers, which Dr. Oliver denied. However, he did prescribe Skelaxin with one refill. R. at 201.

During Plaintiff's January 10, 2003 examination, Plaintiff had difficulty with motion of the lumbar spine, could flex forward to where his hands come down just below the knees with difficulty and had some mild give-way weakness in the dorsi flexor and plantar flexor of the left foot, which Dr. Olive attributed to poor effort. At that point, Dr. Olive felt Plaintiff had reached maximal medical improvement. R. at 200. Dr. Olive released Plaintiff from care with a 20 pound lifting restriction. R. at 200.

David G. Paff, M.D., examined Plaintiff on April 7, 2003. R. at 212. Plaintiff complained of a constant burning sensation in his lower back, although it waxes and wanes, depending on what he does.. Plaintiff stated that his position of comfort was laying on his back with his feet on the floor and his knees bent. R. at 212. Plaintiff complained that he could sit comfortably for 30 minutes, stand for 30 minutes and can walk for about 30 minutes and then the pain gets worse. Based upon his examination and review of Plaintiff's records, Dr. Paff opined that further treatment would unlikely be of any value. R. at 214. Plaintiff has fifteen percent (15%) permanent partial disability to his body as a whole as a result of his injury. Dr. Paff felt surgery was an option, though not necessary at that time. He further recommended Plaintiff discontinue treatment for pain at that time. R. at 214.

On July 10, 2003, Plaintiff was referred by his attorney to Eva Wilson, Psy. D., for a clinical evaluation. R. at 216. Plaintiff met with Dr. Wilson after many emotions surfaced following his accident. Dr. Wilson noted Plaintiff is very bitter and feels useless because he is unable to work. R. at 216. Plaintiff had considerable depression and has had suicidal ideation. Plaintiff appeared to be experiencing anxiety and depression as a result of chronic pain. Plaintiff claimed there are times when he has no memory and cannot concentrate. Plaintiff noted he was constantly angry and spends most of his day lying, sitting and watching television. R. at 217. Plaintiff indicated he was happily married for six years until the injury. Dr. Wilson opined Plaintiff would have a great deal of difficulty sustaining concentration and persistence with any task at that time, but that he could understand and remember simple but probably not semi-complex or complex

4

Case 6:05-cv-03464-ODS   Document 14   Filed 06/06/06   Page 4 of 13

instructions because of depressive and anxious symptomology. R. at 218. Further, Plaintiff would have difficulty interacting socially with the public due to the fact that he tends to become angry and short-tempered, but he would not have trouble adapting to his environment. R. at 218. Dr. Wilson diagnosed Plaintiff with mood disorder, due to chronic pain with depressive and anxious features, dysthmyic disorder, cognitive disorder NOS, borderline intellectual functioning, history of back and knee injury, marital problems due to emotional difficulties, and a current GAF of 50. R. at 218.

On December 30, 2003, Plaintiff met with Ted A. Lennard, M.D., at the Springfield Neurological and Spine Institute in Springfield, Missouri. R. at 219. He complained of pain generally in the low back extending to both lower extremities with complaints of tingling and burning sensation in both feet. R. at 219. He reported it gets worst with movement for any prolonged period of time, as well as prolonged sitting. Plaintiff explained his typical day as lying down and watching television, sleeping, sitting in a recliner, reading a magazine and stretching. At that time he was receiving no treatment beyond over the counter aspirin or ibuprofen. R. at 219. Plaintiff reported smoking one and a half packs of cigarettes per day for the last ten years. He consumes "one to four plus" alcoholic beverages daily to weekly for the last three years. R. at 220. Dr. Lennard noted Plaintiff walked with a slight limp and complained of back pain with movement. He opined Plaintiff would have difficulty with tasks requiring moderate lifting and repetitious bending. R. at 222. However, he also noted Plaintiff gave poor effort when testing the major muscle groups of both legs. R. at 221.

Dr. Kenneth Burstin evaluated Plaintiff's psychological impairments on January 13, 2004 based upon Dr. Wilson's evaluation. R. at 225. He found Plaintiff had a severe impairment that was not expected to last 12 months. He determined Plaintiff had mild limitations in activities of daily living, and maintaining social functioning, maintaining concentration, persistence or pace. R. at 235. Dr. Lennard further noted Plaintiff was partly consistent and credible but that Plaintiff was not receiving treatment at the time which would improve his condition. R. at 237.

Dr. Stephen Theis determined Plaintiff's residual functional capacity as follows: Plaintiff could frequently lift and/or carry ten pounds, occasionally lift and/or carry 20

5

pounds, stand and/or walk two hours or continuously for 30 minutes, sit with usual breaks for two hours, or continuously for 30-60 minutes, limited ability to push or pull against resistence, never climb, stoop, kneel, crouch or crawl, occasionally balance, limited ability to reach, unlimited ability to handle, finger, feel, see, speak and hear. R. at 251. Plaintiff would be required to take unscheduled breaks during an eight hour shift "more often than not," and would be absent from work more than four days per month. R. at 252.

Beginning on April 19, 2004, Plaintiff was treated by Dr. Lane Andelin. R. at 254. While Dr. Andelin chose not to release his treatment notes, he summarizes the same in a letter to Plaintiff's attorney. Dr. Andelin treated Plaintiff in seven sessions from April 2004 through November 2004. R. at 256. Dr. Andelin diagnosed Plaintiff with Major Depression (Major Depressive Disorder) and Anxiety Disorder NOS. R. at 259. He reported Plaintiff had shown some alleviation of depression feelings and anxiety through therapy and anti-depressant medications. Further, his anger had become more manageable. R. at 255. Dr. Andelin filled out a Medical Source Statement which reported Plaintiff would be moderately limited in remembering locations and work-like procedures, but little difficulty understanding and remembering very short and simple instructions. R. at 259. Plaintiff would be markedly limited in his ability to maintain attention and concentration for extended periods of time, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, complete a normal workday and week without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. R. at 259-60. Plaintiff would be moderately limited in his ability to understand, remember and carry out detailed instructions, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, interact appropriately with the general public, accept instructions and respond appropriately to criticism from superiors, get along with co-workers or peers without distracting them or exhibiting behavioral problems, respond appropriately to changes in the work setting, be aware of the normal hazards and take appropriate precautions and set realistic goals independently of others. R. at 259-262.

Dr. Andelin indicated Plaintiff would be able to understand, remember and carry out simple instructions, as well as make judgments that are commensurate with the functions of unskilled work. However, Dr. Andelin opined Plaintiff would not be able to respond appropriately to supervision, co-workers and usual work situations or deal with changes in a routine setting. R. at 262.

In records not available to the ALJ, but submitted to the Appeals Council, Deborah A. Webster, Ph.D., examined Plaintiff on March 29, 2005. R. at 298. After psychological testing and a one-hour clinical interview, Dr. Webster diagnosed Plaintiff with post-traumatic stress disorder and pain disorder associate with both psychological factors and a general medical condition. R. at 295. Plaintiff informed Dr. Webster that when he was 9 years old, his mother's boyfriend threatened to kill Plaintiff, and his mother and sister, before taking his own life. R. at 299. Dr. Webster indicated that because of Plaintiff's psychological symptoms and pain, he may experience less effective outcomes from otherwise appropriate medical interventions, compromising recovery and function. She recommended Plaintiff continue with an outpatient psychotherapy program and consider Social Security Disability based upon psychological factors. R. at 295.

A hearing was held on March 11, 2005 before ALJ Linda D. Carter. R. at 321. Plaintiff testified about the side effects of his medication, including drowsiness and memory difficulty. R. at 327. He testified that he hoped treatment would lead him to be able to work again. R. at 332. He also testified to his daily activities, which include sleeping, watching television and occasionally going to the grocery store. R. at 340.

The ALJ elicited testimony from Terry Crawford, a vocational expert ("VE"). R. at 347. The VE first asked Plaintiff to explain his occupation, differentiating between a licensed automobile mechanic and a tune-up mechanic. Plaintiff described his position as a mechanic before entering management. R. at 348. Having reviewed Plaintiff's vocational history, she characterized his vocational profile as an automobile mechanic, medium work, skilled labor, performed at a heavy exertional level; deliverer, outside, light work, unskilled labor, performed at the heavy exertional level; driver, sales route, medium work, semi-skilled labor, performed at the heavy exertional level; customer

7

service representative, sedentary work, skilled laborer, performed at the sedentary exertional level; manager, retail store, light work, skilled labor, performed at the heavy exertional level; and lubrication servicer, medium work, semi-skilled labor, performed at the heavy exertional level. R. at 348-49. In her first hypothetical, the ALJ asked her to consider a person 28 to 30 years old, with a high school education and past relevant work described above. She was to assume such person has degenerative disk disease, a mood disorder, secondary chronic pain, and dysthmia, and could perform no more than light work, must avoid climbing unprotected heights, potentially dangerous and unguarded machinery and commercial driving, vibration and customer service must not be part of the job description. Further, incidental contact with the public and simple repetitive instructions would be acceptable. R. at 349. The VE testified that such person could not perform Plaintiff's past relevant work. However, the VE testified that such person could perform the jobs of an assembler and a packager. R. at 350. The VE testified that a person who could not sustain eight hours of sitting, standing and walking, or up to two hours of concentration would not be able to sustain employment. R. at 351. Further, assuming the opinions of Dr. Andelin are correct, Plaintiff would be precluded from all employment. R. at 352.

The ALJ determined Plaintiff is not disabled. R. at 30. The ALJ found Plaintiff has not engaged in substantial gainful activity since May 21, 2002. Plaintiff has severe degenerative disc disease, dysthymia, and mood disorder due to chronic pain, but that he does not have an impairment or combination of impairments list in or medically equal to one listed in 20 C.F.R., Part 404, Subpart P, Appendix 1. R. at 29. The ALJ did not find Plaintiff's statements concerning his impairments and their impact on his ability to work entirely credible in light of his description of his activities, lifestyle and medical history. The ALJ found Plaintiff does not have any acquired work skills that are transferable to the skilled or semi-skilled work functions of other work. R. at 29. Finally, the ALJ found there are significant number of jobs in the national economy that he could perform. R. at 30.

## II. DISCUSSION

A. Standard

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

B. Credibility

Plaintiff first alleges the ALJ improperly discredited Plaintiff's treating physician. In doing so, the ALJ determined that Plaintiff's statements concerning his impairments and their impact on his ability to work was not entirely credible. R. at 25. The familiar standard for analyzing a claimant's subjective complaints of pain is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the

9

> testimony and complaints. The adjudicator must give full
> consideration to all of the evidence presented relating to
> subjective complaints, including the claimant's prior work
> record, and observations by third parties and treating and
> examining physicians relating to such matters as:
>
> 1. The claimant's daily activities;
> 2. the duration, frequency and intensity of the pain
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's
> subjective complaints solely on the basis of personal
> observations. Subjective complaints may be discounted if
> there are inconsistencies in the evidence as a whole.

739 F.2d at 1322.

After consideration of the entire record, the ALJ determined that Plaintiff has functional limitations, but that Plaintiff's testimony describing totally incapacitating limitations are unsupported by the totality of the medical and other evidence in the record. R. at 25. The ALJ noted Plaintiff alleged total disabling symptoms, but there was no indication in even his treating physician's records reporting such restrictions. R. at 27. The ALJ pointed out that some of Plaintiff's physicians recognized Plaintiff may have been exaggerating his symptoms. For instance, Dr. Lennard noted Plaintiff gave "poor effort" in clinical testing of his strength and range of motion, and Dr. Pak stated Plaintiff's complaints of pain were "out of proportion" with clinical findings. R. at 201 and 278. Moreover, the ALJ observed Plaintiff was able to sit comfortably during the course of the hearing with no unusual posture, no shifting of weight, no expressed need for to stand or change position and betrayed no evidence of pain or discomfort while testifying. R. at 23.

A treating physician's opinion is given 'controlling weight' if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence. However, a treating physician's opinion does not automatically control, since the record must be evaluated as a whole. Goff v.

10

Barnhart, 421 F.3d 785, 791 (8th Cir. 2005). An ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions. Id. The ALJ gave substantial weight to Drs. Paff, Pak and Scarrow even though they examined Plaintiff on a one-time basis and did not have an ongoing treating relationship with him, because they are specialists in occupational health, pain and neurology and in evaluating impairments. R. at 26. As noted, these professionals' opinions are consistent with Dr. Theis who treated Plaintiff for two years following his accident. R. at 335.

The ALJ found that Plaintiff's treating physician's opinion was not supported by the other records in the case and his exertional limitations were "too extreme to be useful." R. at 26. The ALJ also noted that Dr. Theis prescribed narcotics, but his treatment notes did not comment on any objective medical evidence. R. at 26. The ALJ also determined that the medical source statements of Drs. Andelin and Wilson are not supported by objective medical evidence and are based primarily on the subjective statements of Plaintiff rather than objective tests or findings, which as discussed above, the ALJ properly discounted. As the ALJ noted, Dr. Wilson's records indicate Plaintiff could understand and remember simple instructions, yet in the medical source statement she noted Plaintiff was unable to understand, remember or carry out simply instructions. R. at 26-27.

C. Residual Functional Capacity

Plaintiff also claims the ALJ erred in determining his residual functional capacity and improperly determined that Plaintiff retained the capacity to perform other work found in significant numbers in the national economy. The ALJ considered the evidence and the record as a whole and determined Plaintiff had the residual functional capacity to perform light work, requiring maximum lifting of twenty pounds and occasional bending, stooping, kneeling, crouching and crawling. R. at 29. He can perform simple repetitive work with no customer service. He found Plaintiff was unable to perform his past relevant work, which included work as an auto mechanic, outside deliverer, sales

11

route driver, customer service representative, retail store manager and lubrication serviceperson. R. at 29. In determining Plaintiff's ability to perform other work, the ALJ considered all of the evidence, Plaintiff's age, education, past relevant work experience and Plaintiff's residual functional capacity for light work, along with the testimony of a vocational expert. A vocational expert's response to a hypothetical question provides substantial evidence where the hypothetical sets forth with reasonable precision the claimant's impairments. Starr v. Sullivan, 981 F. 2d 1006, 1008 (8th Cir. 1992). The VE testified that Plaintiff could perform such light, unskilled work as a production assembler or a hand packager.

D. Newly Submitted Evidence

Plaintiff also contends new evidence has been submitted justifying a reversal, or in the alternative, a remand. As discussed above, the ALJ properly discredited the opinions of Drs. Wilson and Andelin. The Court must determine whether the ALJ's determination is supported by substantial evidence, including newly submitted reports. Riley v. Shalala, 18 F. 3d 619, 622 (8th Cir. 1994). The ALJ rendered her decision on April 19, 2005 and Dr. Webster submitted an opinion on April 22, 2005. Dr. Webster's report indicates Plaintiff is angry, but has the ability to control his emotions. R. at 300. She found Plaintiff to be intelligent and articulate and that he does not have any other type of psychosis. R. at 300. The submitted report does not change the conclusion that the ALJ's decision is supported by the substantial evidence of the record.

III. CONCLUSION

Substantial evidence in the record as a whole supports the ALJ's findings regarding Plaintiff's credibility and residual functional capacity, and the VE's testimony provided a substantial basis for concluding Plaintiff can perform work in the national economy. The Commissioner's final decision is affirmed.

IT IS SO ORDERED.

DATE: June 6, 2006  /s/  Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
UNITED STATES DISTRICT COURT